Ntirety

MANAGED SERVICES   SOLUTIONS   PARTNERS   RESOURCES

ABOUT

TRUST CENTER   SUPPORT   PARTNER LOGIN   CUSTOMER LOGIN   **GET STARTED**

# Master Services Agreement (MSA)

Last updated March 3, 2022

**MASTER SERVICES AGREEMENT**

This Master Services Agreement is entered into by and between Ntirety, Inc., a Delaware corporation, with its principal place of business at 2901 Via Fortuna, Suite 175, Austin, Texas 78746 ("Ntirety"), and the individual or entity who is designated as the "Client" when clicking through to accept these terms online or when signing on the signature page of an SOF or SOW ("Client"). Ntirety and Client may each be referred to individually as a "Party" and may be collectively referred to as the "Parties" in this MSA. The complete agreement between Ntirety and Client consists of (1) the terms below, (2) all service order forms and/or statements of work executed hereunder, and (3) all applicable services addenda attached hereto (together, documents (1) through (3) will be collectively referred to as the "MSA").

1. **Definitions**

   The capitalized words used herein this agreement will have the meanings ascribed to them in the attached Schedule 1

2. **Services**

   2.1   Provision of Services. Ntirety will provide Client with the Services set out on each SOF, subject to and in accordance with the terms of this MSA. Ntirety agrees to use good faith efforts to implement the Services in accordance with the applicable SOF. Client is responsible for providing Ntirety with all information, access (including continuous root administrative access to all computer servers licensed to Client and under Client's control as part of the Services), and good faith cooperation required by Ntirety in order to provide the Services, including Technical Support, to Client. If Client refuses or fails to permit such access, Client understands and agrees that Ntirety is not responsible for any malfunction or delay in the performance of the Services resulting therefrom. Ntirety reserves the right to physically access the Systems (including servers assigned to Client) at any time in order to ensure the continuity of the Services. To prevent downtime caused by outdated components or malfunction of the Systems, Client consents to (a) Ntirety upgrading, repairing, or otherwise replacing the Systems that are hosting Client Data from time to time with or without notice to Client, and/or (b) if necessary, Ntirety migrating Client Data within the Systems from time to time with or without notice to Client. Notwithstanding the foregoing, Ntirety will make good faith efforts to notify Client in advance of such upgrades, repairs, replacement, or migration when such action is a planned event.

   2.2   Third Party Vendors and Products. Ntirety may (at Ntirety's sole discretion) provide any of the Services (in whole or in part) through an Ntirety Affiliate, a Third Party Vendor, or other subcontractor(s). The terms and conditions for the use of any such Third Party Products that are incorporated into the Services are passed through to Client via this MSA where permitted by the applicable Third Party Vendor. However, certain Third Party Vendors, such as Microsoft, Amazon, and Red Hat, require Ntirety to incorporate the terms and conditions for their Third Party Products into this MSA by specific reference, and such terms and conditions are included as Schedule 2 attached hereto this MSA. The foregoing is not an exhaustive list of the Third Party Products and Third Party Vendors that may be used by Ntirety in the course of providing the Services. Client acknowledges that Third Party Products may become unavailable at any time. Any mention of Third Party Products by Ntirety, its employees, or any third party entity related to Ntirety is for information purposes only and does not constitute an endorsement or recommendation by Ntirety.

   2.3   Governing Policies. To ensure the stability of the Ntirety network and to comply with laws, regulations, and Internet standards, Ntirety relies upon the Acceptable Use Policy (https://www.ntirety.com/acceptable-use-policy/),

**Exhibit 2**

Schedule 2) (if applicable). Altogether these three documents will be referred to herein as the "Policies". The Policies are incorporated into and made an integral part of this MSA by this reference. Client will comply with the Policies and will ensure that the Services are used in compliance with the Policies, including by using contractual terms no less restrictive than the Policies in Client's agreements with its End Users. Ntirety may amend the Policies from time to time in its sole discretion, and such amendments will be effective as soon as the amended Policies are posted to the applicable URL(s). Notwithstanding the foregoing, Ntirety will not change the Policies arbitrarily, and, other than in an emergency (including imminent threat to the Systems or Services) or as required by law, Ntirety will endeavor to provide Client with advance notice of any change to the Policies, provided, that the failure to provide such advance notice will not affect the validity of such changes.

2.4      Services or Systems Audit. Ntirety may use the access Client provides under Section 2.1 above for the purposes of conducting or performing an audit or report (whether by Ntirety directly or by an authorized independent auditor) to comply with (i) any applicable statute or government regulation, or (ii) a Third Party Vendor requirement (such as in the course of a Third Party Audit). Third Party Vendors are permitted to perform their Third Party Audits directly on the Systems (including any computer server or other hardware licensed to Client by Ntirety as part of the Services) with regards to their respective Third Party Products. If Client Data includes any software or application licensed independently by Client from the same Third Party Vendors as used by Ntirety but were not included the Services ordered by Client, Client is solely responsible for supporting such software or application including maintaining the licenses and installing updates and upgrades to such software or application, and Ntirety will not be liable, for any unpaid licenses installed by Client on the Systems that are discovered and reported in the course of a Third Party Vendor Audit.

2.5      Service Modifications. Ntirety may, at its reasonable discretion, add to, modify, remove, or re-price any particular product or Services based on factors such as unavailability of Third Party Products. If Ntirety intends to remove or make any material changes to any of the Services included on a current SOF or SOW, then Ntirety will provide Client with at least 60 calendar days' prior written notice via electronic mail identifying the changes and when such changes will take effect. Notwithstanding the foregoing, if Ntirety receives less than 60 days' notice of unavailability of a Third Party Product or material changes to a service by a Third Party Vendor, Ntirety may implement such changes to the correlating Services with less than 60 calendar days' prior notice to Client. Client will have 14 calendar days from its receipt of the notice to notify Ntirety in writing of any objection to the modification. Only if Ntirety is unable to accommodate Client's objection or implement alternatives acceptable to Client, then Client's sole remedy will be to terminate the SOF or SOW without Termination Fees. If Client does not provide Ntirety with a written objection during the notice period, then Client will be deemed to have agreed to the changes identified in the modification notice.

### 3. Billing and Payment

3.1      Service Fees. Client will pay Ntirety in a timely manner the Service Fees set forth on each SOF or SOW (as applicable) and any additional fees for add-on or one-off Services that may not be specified in a SOF or SOW but were separately requested by Client. Recurring Service Fees for each Service will begin to accrue on the earlier of (i) the SOF Availability Date, (ii) 30 calendar days following the applicable SOF Start Date, or (iii) as stated in the SOW. Setup Fees will begin to accrue on the applicable SOF Start Date. Some Service Fees are based on use of the Services and will be calculated as set out on the SOF or SOW. Ntirety bills in advance, except for those Service Fees based on usage which are billed in arrears. Service Fees based on usage will vary accordingly depending on Client's actual usage. If the SOF or SOW includes Services that are billed based on the time and materials used by Ntirety (including any of its Affiliates or Third Party Vendors), such as Professional Services, then Client acknowledges and agrees that the Service Fees are subject to change from the amount estimated in the SOF or SOW depending on Ntirety's actual time and materials used, provided that Ntirety will obtain Client's prior approval for any additional billable time that exceeds the amount described in the SOF or SOW. A SOF or SOW may include fees for a Third Party Product provided by or through a Third Party Vendor, and Ntirety cannot guarantee that such fees will remain the same. If a Third Party Vendor increases its fees, Ntirety may proportionately adjust its fees after giving Client 30 days' prior written notice of such adjustment.

3.2      Taxes. Service Fees exclude applicable taxes. Client will pay all federal, state, provincial or other goods and services taxes assessed upon or related to Client's purchase of the Services (except for taxes based on Ntirety's net income), unless Client provides Ntirety with a valid tax exemption certificate.

3.3      Billing. The Billing Cycle for each SOF or SOW will commence upon the date that Ntirety issues the first invoice to Client (either by email or through the Client Portal). If Client has authorized Ntirety to bill Client's credit card, then the Billing Cycle will commence upon the date that Ntirety first charges Client's credit card. Thereafter, the Billing Cycle will recur at the frequency set forth in such SOF or SOW until that SOF, SOW, or the entire Client

**Exhibit 2**

Account expires or is terminated in accordance with this MSA. Notwithstanding the foregoing, certain Services may consist of several distinct components that will have separate Billing Cycles despite being on the same SOF or SOW. Unless otherwise stated in a SOF or SOW, recurring Service Fees will be invoiced in advance at the beginning of each Billing Cycle, and Service Fees based on usage will be invoiced in arrears for Client's usage in the prior Billing Cycle. Add-on features, if ordered separately, may be charged monthly, per the Billing Cycle, or per an alternate payment schedule as agreed to by Ntirety when Client orders such features. Add-on features are non-refundable.

3.4     Past Due Amounts. Service Fees (along with taxes and expenses) are due on the Invoice Date. If Client fails to pay all undisputed Service Fees within 30 calendar days of the Invoice Date, Ntirety may assess a late payment charge equal to the lesser of (i) 1.5% times the unpaid amount per month or (ii) the maximum amount permitted by law. Client will pay all of Ntirety's reasonable expenses associated with any collection efforts, including reasonable attorneys' fees and court costs. Ntirety may suspend the Client Account or terminate the SOF or SOW, in whole or in part, upon written notice to Client if Service Fees (a) remain unpaid in full for more than 60 calendar days following the Invoice Date, or (b) are not paid within 30 calendar days of the Invoice Date for any 3 invoices in a given 6-month period. Ntirety reserves the right to terminate this MSA and cancel the Client Account in its entirety if the Service Fees remain past due following reasonable notification from Ntirety to the contact person listed in the Client Account. Client is solely responsible, and Ntirety is not responsible, for keeping Client's billing contact information up to date and for any failure to receive such notification of Client Account cancellation.

3.5     Billing Dispute. Client may dispute the Service Fees (in whole or in part), so long as such dispute is made in good faith and provided that Client (i) pays all undisputed amounts on the Invoice Date, and (ii) provides Ntirety with written notice of and evidence supporting such dispute within 15 days of the Invoice Date. Ntirety and Client will then attempt in good faith to resolve such dispute within 30 calendar days of Ntirety's receipt of Client's notice and supporting evidence; provided that, in the case of any disagreement between the parties, Ntirety's determination shall be final. Any disputed amount found to be properly owed to Ntirety will be paid within 5 days following resolution of the dispute, together with the applicable late payment interest fee on such amount accrued from the original due date for such amount. If Client does not provide Ntirety with written notice of a billing dispute before the invoice due date, then Client will be deemed to have accepted the amounts as invoiced and will be obligated to pay such amounts.

3.6     Payment Methods. Ntirety accepts the following payment methods:

- check or money order;
- credit card (Visa, MasterCard, Discover); or
- bank wire or Automated Clearing House ("ACH").

Unless stated otherwise in the SOF or SOW, all Service Fees are in United States Dollars.

## 4. Term & Termination

4.1     Term. The Term of this MSA will commence as of the Effective Date and will continue as long as there is a SOF or SOW in effect. A SOF will bind Ntirety and Client as of its SOF Start Date and will continue for the SOF Initial Term. At the end of such SOF Initial Term, the SOF will automatically renew for successive Renewal Terms, unless either Party provides the other Party with written notice of non-renewal at least 90 calendar days prior to the expiration of the current term of such SOF. Each SOF may have its own SOF Initial Term or Renewal Term, and the expiration or termination of any particular SOF will not affect the SOF Initial Term or Renewal Term of any other SOF currently in effect. A SOW will bind Ntirety and Client as of the date of Client's signature on such SOW and will continue for the SOW Service Term set forth therein. At the end of such SOW Service Term, the SOW will automatically expire unless a Renewal Term is expressly provided in the SOW or the Parties mutually agree to extend the SOW Service Term. Each SOW may have its own SOW Service Term, and the expiration or termination of any particular SOW will not affect the SOW Service Term of any other SOW currently in effect.

4.2     Termination for Convenience. Unless otherwise stated in the SOF or SOW, Client may terminate a SOF or SOW in whole or in part for convenience at any time by providing Ntirety with 90 calendar days' prior written notice and payment of the applicable Termination Fee. Termination of all SOFs and SOWs will be deemed a termination of the MSA in its entirety subject to the survival clauses specified therein and below.

4.3     Termination for Cause. Either Party may terminate this MSA and/or the SOF or SOW upon written notice to the other Party, in the event that:

(a)   Such other Party breaches a material obligation of the SOF or SOW or this MSA and (i) such breach is not cured within 30 calendar days (or 10 business days in the case of non-payment by Client) following the breaching Party's receipt of written notice from the non-breaching Party, in which case such termination will be effective as of the end of such 30 calendar day period (or 10 business days in the case of non-payment by Client) or (ii)

**Exhibit 2**

such breach is incurable, in which case such termination will be effective upon the breaching Party's receipt of written notice from the non-breaching Party. Client acknowledges and agrees that this provision will not apply to Ntirety's delivery of the Services and that Ntirety's sole liability and Client's sole remedy for any malfunctions of or defects in, or any other performance or outage issues associated with, a particular Service will be the applicable SLA set forth in the Addendum or Addenda for that Service;

(b)   Such other Party becomes the subject of any insolvency, receivership, or bankruptcy proceeding or makes an assignment for the benefit of creditors or ceases to do business; or

(c)   An event of Force Majeure has made the Services unavailable for 30 continuous days.

4.4      Termination Fee. In the event that Ntirety terminates this Agreement or any particular SOF or SOW pursuant to Section 4.3(a) or Client terminates pursuant to Section 4.2, Client will pay the Termination Fee to Ntirety within 5 days of the termination date. Client acknowledges and agrees that (i) Ntirety uses the contractual commitments of its customers, including Client, to make its own commitments to capacity and growth, including making significant capital expenditures, (ii) the amount of the Termination Fee is a reasonable approximation of the damages that Ntirety will suffer due to Client's early termination, and (iii) this provision is a material inducement to Ntirety entering into this MSA.

4.5      Post-Termination Migration Grace Period. Subject to the remainder of this paragraph, Client acknowledges that, upon termination of an applicable SOF or SOW, all Services associated with such SOF or SOW (including data backup, if ordered) will immediately cease and upon termination of the MSA, all Services associated with the Client Account in their entirety (including data backup, if ordered), will immediately cease.  It is Client's sole responsibility, and not the responsibility of Ntirety, to ensure that all Client Data is either retrieved prior to termination or backed up on systems other than the Systems prior to the termination date. Provided that Client was in good standing as of the termination date, Ntirety may, but is not obligated to, grant Client a 60 day post-termination migration period for Client to migrate all of Client Data to a new hosting provider or to otherwise remove all Client Data from the Systems. Any such migration period must be confirmed in writing between the Parties prior to the termination date. Client's ordinary Service Fees will continue to apply during such migration period until Client notifies Ntirety that Client Data has been completely migrated or the expiration of the 60 days, whichever is earlier. If any Client Data remains on the Systems beyond termination or this migration period, whichever is applicable, then Ntirety may, at its sole reasonable discretion, (a) delete such Client Data, or (b) retain the Client Data on the Systems and charge Client the fees associated therewith, in which case Ntirety may delete Client Data at any time if Client fails to timely pay such fees.  Client acknowledges that this post-termination migration entails the actions of Client and its new hosting provider and does not entail any action on Ntirety's part other than to provide access to the Client Data. Upon Client's written request, Ntirety may provide reasonable migration assistance, in which case, Ntirety may charge (and Client will pay in advance) the Service Fees Ntirety ordinarily charges for migration Service of the magnitude and complexity that Client requires.

4.6      Suspension. In addition to any other rights or remedies available to Ntirety in this MSA, at law, in equity, by statute or otherwise, Ntirety may suspend the Services at any time upon written notice to Client in the event and for the period of time that: (i) providing the Services is prohibited by applicable law or regulation; (ii) Client fails to pay any invoiced amount (except for an amount disputed in good faith in accordance with Section 3.4) within 30 days of the Invoice Date; or (iii) the Services are used in violation of the Policies or applicable law or regulation. In the event that Ntirety suspends the Services pursuant to clause (ii) or (iii) above, Client will pay all amounts for the Services during the period of suspension as if no suspension had occurred.

5. **Representations and Warranties**

Client and Ntirety represent and warrant to each other that such Party has the power, authority, and legal right to enter into and to perform such Party's obligations under this MSA. Client represents and warrants that Client and its End Users, as applicable, own or are duly authorized to use, upload, store, or process all Client Data and Intellectual Property transmitted by, used, or hosted on the Systems in connection with the Services.

6. **Disclaimer**

NOTWITHSTANDING ANY COMMUNICATIONS BETWEEN NTIRETY AND CLIENT, EXCEPT AS EXPRESSLY STATED IN THIS MSA, NEITHER NTIRETY NOR ANY OF ITS EMPLOYEES, AFFILIATES, AGENTS, SUPPLIERS, SUB-CONTRACTORS, OR LICENSORS MAKE ANY WARRANTIES OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED, ARISING FROM COURSE OF DEALING, COURSE OF PERFORMANCE, OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONFORMITY TO ANY REPRESENTATION OR DESCRIPTION,  NON-INTERRUPTION, NON-INTERFERENCE, OR NON-INFRINGEMENT, OR ANY WARRANTIES THAT THE SERVICES WILL BE COMPLETELY SECURE OR ERROR-FREE. EXCEPT AS EXPRESSLY STATED IN THIS MSA, THE SERVICES AND SYSTEMS PROVIDED UNDER OR ASSOCIATED WITH THIS MSA,

**Exhibit 2**

INCLUDING THIRD PARTY PRODUCTS OR EQUIPMENT, ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. CLIENT'S USE OF THE SERVICES WILL BE AT ITS OWN RISK. EACH OF THESE DISCLAIMERS WILL APPLY UNLESS PROHIBITED BY APPLICABLE LAW.

### 7. Indemnification

7.1     Mutual Obligation. Subject to the disclaimers herein, if a Party or any Representative of such Party (collectively "Protected Party") incurs any Losses because of any third party Claim arising out of or in connection with the acts or omissions of the other Party or its employee, contractor, or agent (collectively "Indemnifying Party") which amount to (a) personal injury or death, or theft of tangible personal property caused by the Indemnifying Party, (b) gross negligence or willful misconduct, or (c) alleged or actual violations by the Indemnifying Party of any law, regulation or rule, then the Indemnifying Party will indemnify, reimburse, and compensate the Protected Party for all Losses, as they accrue and become payable by the Protected Party, and defend, hold harmless, and protect the Protected Party from and against all Claims.

7.2     Ntirety Obligation. If Client (including its Representatives) incurs any Losses because of a third party Claim arising out of or in connection with an allegation that the Services or Systems directly infringe the Intellectual Property rights of a third party under the laws of the country in which such Services are provided to Client, then Ntirety will defend, hold harmless, and protect Client from and against all such Claims related thereto. Ntirety's sole and exclusive liability under this Section 7.2 will be limited to Ntirety, in its sole discretion and at its own cost, either making such Services non-infringing, or obtaining a license or consent to allow Client's continued use of such Services, and, if neither of these options is commercially practicable, in Ntirety's sole reasonable discretion, Ntirety will terminate such Services (including any support of or related to such terminated Services) and refund to Client any prepaid Service Fees received by Ntirety for such terminated Services. Notwithstanding anything to the contrary, Ntirety will have no liability or obligation for any infringement based on unauthorized use or modification of the Services, use of the Services in combination with any Intellectual Property (as defined below) not owned by Ntirety, or Client's failure to install updates or patches.

7.3     Client Obligation. If Ntirety (including its Representatives) incurs any Losses because of any third party Claim arising out of, or in connection with, the use of the Services by Client (including by its Representatives or End Users), including, but not limited to, Claims arising out of allegations that the Services have been used, or use has been facilitated by Client, in a way that (a) infringes the Intellectual Property rights of a third party under the laws of a country in which such Services have been used or use has been facilitated by Client, (b) violates the Policies; or (c) violates any law, regulation or rule, then Client will defend, hold harmless, and protect Ntirety from and against all Claims related thereto.

7.4     Indemnification Procedure. The indemnification obligations of this Section 7 will be conditioned on the Protected Party (a) promptly notifying the Indemnifying Party in writing of the circumstances giving rise to such Loss such that there is no material prejudice to the Indemnifying Party due to the timing of the delivery of such notice and (b) giving the Indemnifying Party complete authority and information for the defense or settlement of the matter, provided, that (i) the Protected Party will have the right to participate in the defense of the matter at such Party's expense, and (ii) the Indemnifying Party will not settle the matter without the Protected Party's prior written consent if such settlement contains material equitable relief or an admission of liability or fault attributable to the Protected Party.

### 8. Limitation of Liability

8.1     Scope. EXCEPT WITH RESPECT TO A PARTY'S BREACH OF ITS OBLIGATIONS OF NONDISCLOSURE AND NON-USE OF PROPRIETARY CONFIDENTIAL INFORMATION OF THE OTHER PARTY, TO THE EXTENT PERMITTED BY APPLICABLE LAW AND REGARDLESS OF THE BASIS FOR A CLAIM, UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT DAMAGES OF ANY NATURE (INCLUDING, BUT NOT LIMITED TO, CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, OR PUNITIVE DAMAGES OR DAMAGES FOR BUSINESS INTERRUPTION OR LOSS OF REVENUES, PROFITS, DATA, OR BUSINESS INFORMATION) THAT ARISE OUT OF OR IN CONNECTION WITH THIS MSA, ANY AGREEMENT BINDING ON OR ENFORCEABLE BY EITHER PARTY RELATED TO THE SERVICES, OR THE PROVISION OF THE SERVICES. THIS LIMITATION WILL APPLY EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF THESE DAMAGES AND EVEN IF SUCH DAMAGES WERE FORESEEABLE. CLIENT AGREES THAT FOR THE PURPOSES OF THIS SECTION, LOST REVENUES AND LOST PROFITS DO NOT INCLUDE CLIENT'S PAYMENT OBLIGATIONS TO NTIRETY PURSUANT TO THIS MSA.

8.2     Amount. To the extent permitted by applicable law and except for (i) the Parties' respective indemnification obligations with respect gross negligence and willful misconduct, (ii) Client's payment obligations with respect to Service Fees and related taxes and expenses, and (iii) the Parties' respective obligations of nondisclosure and non-use of the other Party's proprietary Confidential Information, each Party's liability arising out of this MSA, any agreement binding on or enforceable by either Party related to the Services, and the

**Exhibit 2**

... will not exceed the average amount equal to six times the average monthly payment of Service Fees during the 6 calendar months immediately prior to the event giving rise to the liability.

### 9. **Confidential Information.**

Each Party agrees: (a) to hold the Confidential Information of the other Party in strict confidence using the same standard of care that such party uses to protect its own confidential information, but no less than reasonable care, and (b) not to use or disclose the Confidential Information of the other Party to any third party, other than as necessary to provide the Services, as permitted by the Policies, or as required by applicable law, court order, or regulation. In the event that a Party is required by applicable law, court order, or regulation to disclose the other Party's Confidential Information, such Party will, unless prohibited by law, provide the other Party a reasonable opportunity to obtain, at the other Party's expense, a protective order. Ntirety will have the right and license to use residuals, where "residuals" means ideas or know-how in non-tangible form that may be retained in the unaided memories of Representatives of Ntirety.

### 10. **Data Standards and Protocols**

10.1    System Security. During the Term of this Agreement, Ntirety will use industry standard measures to detect and prevent unauthorized third parties from accessing the Systems. Notwithstanding anything to the contrary, Client acknowledges that Ntirety does not guarantee, and does not represent or warrant, that the Systems cannot or will not be accessed by unauthorized third parties. At least once per calendar year, scheduled at Ntirety's sole discretion, Ntirety will retain an independent external auditor to conduct an audit of Ntirety's internal systems and computer controls used for Ntirety's dedicated hosting services. Upon Client's written request and the Parties' execution of Ntirety's standard Non-Disclosure Agreement, Ntirety will provide Client with a copy of the then-current audit report. Client acknowledges that (a) audits are conducted by the external auditor in arrears for the preceding year, (b) the audit report for a given year may not be available until the expiration of the previous year's audit report, (c) Ntirety is not in breach of the MSA because of delays in delivering to Client a current audit report at or after the expiration of the previous period's audit report, and (d) the audit is only for Ntirety's own internal systems and computer controls and does not include any report, detail, representation, or warranty pertaining to Client's own internal systems and computer controls. It is Client's sole responsibility, and not the responsibility of Ntirety, to conduct Client's own security audit, as necessary or applicable.

10.2    PCI-DSS. To the extent Ntirety collects, processes, and stores Client's credit card information on the Systems, Ntirety will follow the Payment Card Industry Data Security Standard ("PCI-DSS"). At least once per calendar year, scheduled at Ntirety's sole discretion, Ntirety will conduct a self-assessment and retain a PCI-DSS service provider to perform vulnerability scans and issue applicable PCI-DSS compliance certificates. Client acknowledges that (a) PCI-DSS scans, questionnaires, and other assessment procedures may extend beyond the expiration date of the previous PCI-DSS certification period, (b) dealings with the PCI-DSS service provider may cause delays which are out of Ntirety's reasonable control, including the occurrence of false positives during the scanning process, (c) PCI-DSS certificates of compliance for a given assessment period may be unavailable from the PCI-DSS service provider before the expiration date of the previous period's certification, (d) Ntirety is not in breach of the MSA because of delays in delivering to Client a current PCI-DSS certificate (or other proof) of compliance at or after the expiration of the previous period's certification, and (e) the PCI-DSS certification is only for Ntirety's own PCI-DSS compliance and does not include any certification, representation, or warranty pertaining to Client's own Payment Card Industry Data Security Standard requirements, as necessary or applicable.

### 11. **Intellectual Property**

In order to permit Ntirety to provide the Services, Client will obtain and maintain all rights, consents, and approvals required to grant Ntirety and its agents the right to access, use, and modify any data, content, equipment, and Intellectual Property utilized by Client and its End Users in connection with the Services. Unless expressly stated in this MSA, neither Party will (a) have any right, title, claims, or interest in or to the other party's Intellectual Property, (b) use, copy, modify, or translate any of the other Party's Intellectual Property or related documentation, (c) decompile, disassemble, or reverse engineer any of the other Party's Intellectual Property, (d) distribute or authorize a third party to distribute any of the other Party's Intellectual Property, or (e) remove, alter, or obscure any trademark, service mark, logo or other proprietary notices incorporated in or accompanying the Services. To the extent that any Third Party Products are included or incorporated in the Services, Client agrees that it will only use such Third Party Products in conjunction with the Services. All trademarks and other Intellectual Property rights associated with or attached to a Third Party Product belongs solely to the relevant Third Party Vendor and are subject to license from such Third Party Vendor to be incorporated into the Services. Nothing herein grants to Client any right, title, or interest in or to a Third Party Vendor's Intellectual Property. Ntirety retains all rights that are not expressly granted in this MSA to Client. Client may choose to, but is not required to, provide comments or suggestions or related data to Ntirety regarding possible improvements to the operation,

**Exhibit 2**

by Ntirety, if any, whether as a result of such comments, suggestions, related data or otherwise, will be the exclusive property of Ntirety.

12. **Compliance with Laws**

Each Party will obtain and maintain all permits and licenses required by applicable law or regulations for the provision or use, as applicable, of the Services. Each Party will comply with all applicable law and regulations in connection with this MSA and, in the case of Client, in its and its End Users' use of the Services, including all applicable export control, data protection, Intellectual Property, and consumer protection laws and regulations. Client will be responsible for all acts and omissions of its End Users. Client agrees that: (i) violating applicable export control laws may include selling products or services that are legal to sell in the United States but illegal to export, and (ii) neither Client nor its End Users may use the Services to provide services to individuals or entities with which citizens of the United States may not do business. Client represents and warrants to Ntirety that it has provided, and at all times during the term of this MSA will provide, Ntirety with written notice of all data security and privacy laws, regulations and other legal requirements (including industry-specific laws, regulations, and requirements) applicable to Client's or its End Users' data or information (including personally identifiable information) that may be processed (as defined in the applicable data security or privacy laws, regulations or legal requirements) by Ntirety or its employees, Affiliates, agents or subcontractors in connection with the provision of the Services. Client agrees to execute any further documents required by law or in Ntirety's discretion to maintain compliance. If, during the term of the MSA, Client notifies Ntirety of the effectiveness of any change in law determined to be binding upon Client that results in Ntirety's provision of the Services or Client's use of the Services being in violation of the applicable law or regulation, Ntirety will be permitted to suspend the affected Services, and the Parties agree to negotiate in good faith to modify the Services in a manner designed to permit the Services to be provided by Ntirety and used by Client to comply with the applicable law or regulation (after giving effect to the change in law). Client acknowledges that such modification to the Services may result in additional fees to Client. Client will use reasonable security precautions in connection with its use of the Services, including encrypting any sensitive information (such as nonpublic personal information and protected health information) transmitted by or used in connection with the Services, and require its End Users to use reasonable security precautions. Client and its End Users are responsible for the security of customer credit card numbers and related information to which Client or its End Users may have access as a result of conducting electronic commerce transactions in connection with the Services.

13. **Protected Health Information**

If Client uses, transmits, or otherwise handles any information related to an individual's past, present, or future physical or mental health condition, any treatment for that condition, and any payment for that treatment which information identifies the individual or could reasonably be used to identify the individual (such information referred to as "Protected Health Information" or "PHI"), then Client will: (a) inform Ntirety in writing of Client's intended use of the Services for PHI, (b) comply with all requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing rules and regulations, (c) comply with all requirements of the Health Information Technology for Economic and Clinical Health Act, codified at 42 U.S.C. §§17931-17953 ("HITECH") and its implementing rules and regulations, and (d) execute, as between Client and Ntirety, a Business Associate Agreement as mandated by HIPAA and HITECH (on Ntirety's standard form), whereby Client is the covered entity and Ntirety is the business associate or whereby Client is the business associate and Ntirety is the subcontractor if Client is the service provider of a covered entity (as the terms "covered entity", "business associate", and "subcontractor" are defined by HIPAA and HITECH). In addition to Client's indemnification obligations under this MSA, Client will further indemnify Ntirety (including Ntirety's Representatives) from and against any Claims against Ntirety or Losses incurred by Ntirety that result from: (i) Client's breach of or misrepresentation with respect to Client's obligations regarding Protected Health Information; or (ii) Client's breach of HIPAA, HITECH, or any other relevant statute. Unless Ntirety and Client have executed a Business Associate Agreement, Client hereby represents that Client will not store or transfer any protected health information using the Services.

14. **EU Personal Data**

If Client engages in the "processing" of any "personal data" (as such terms are defined in the EU General Data Protection Regulation 2016/679 ("GDPR")) from the European Union, then Client will: (a) inform Ntirety in writing of Client's intended use of the Services for processing personal data from the EU, (b) comply with all requirements of the GDPR and all implementing rules, associated policies, and directives, (c) execute, as between Client and Ntirety, a data processing agreement in compliance with the GDPR (on Ntirety's standard form), whereby Client is the data controller and Ntirety is the data processor or whereby Client is the data processor and Ntirety is the sub-processor (or level 2 processor) if Client is the service provider of a data controller (as the terms "processor", "controller", and "sub-processor" are defined by the GDPR), (d) adhere to the GDPR, including the designation of

**Exhibit 2**

Client's data protection officer and execution by Client of data processing agreements with data controllers and Client's own sub-processors, and (e) ensure that Client is fully transparent about the nature and purpose of its processing of personal data. In addition to Client's indemnification obligations under this MSA, Client will further indemnify Ntirety (including Ntirety's Representatives) from and against any Claims against Ntirety or Losses incurred by Ntirety that result from: (i) Client's breach of or misrepresentation with respect to Client's obligations regarding processing of personal data from the EU, or (ii) Client's breach of the GDPR or other applicable law. Unless Ntirety and Client have executed a data processing agreement, Client hereby represents that Client will not transfer, store, or otherwise process any personal data from the EU using the Services.

15. **Cross-Border Data Transfers**

15.1    To Provide Services to Client. Client acknowledges that the Services and Third Party Products may be provided from the U.S.A. or any other country in which Ntirety, its Affiliates, and its Third Party Vendors maintain their business operations. As such, in connection with the provision of the Services and any Third Party Products that may be included in the Services to Client, Ntirety, its Affiliates, and the applicable Third Party Vendor(s) may transmit, store, access, process, and use (collectively "Process") Client's data in, to, or from the U.S.A. or any other such country in which they maintain their business operations. Client consents to Ntirety, its Affiliates, and its Third Party Vendors processing Client Data in the U.S.A. or any other country in which Ntirety, it Affiliates, and its Third Party Vendors maintain their business operations.

15.2    Consent Revocation by Client. Client may revoke its consent to having Client Data Processed in the U.S.A., or any other country in which Ntirety, its Affiliates, and its Third Party Vendors may maintain their business operations, by providing Ntirety with written notice of Client's revocation of consent ("Consent Revocation"). Upon receipt of the Consent Revocation, Ntirety will cooperate with Client in transferring all Client Data to a lawful destination of Client's choice. Client acknowledges that such transfer of Client Data entails the actions of Client (and, if applicable, Client's vendor or new hosting service provider) and does not entail any action on Ntirety's part other than providing access to the Client Data. Upon Client's written request, Ntirety may provide Client with reasonable transfer assistance as part of the Services, in which case, Ntirety may charge (and Client will pay in advance) the Services Fees that Ntirety normally charges for migrations of the magnitude and complexity Client requires for such transfer. Client must remove all Client Data off of Ntirety's Systems, within 60 calendar days of the date that Ntirety received the Consent Revocation. If any Client Data remains on Ntirety's Systems beyond such 60 day period, then Ntirety may permanently delete such Client Data and all backups and copies thereof. It is Client's sole responsibility, and not Ntirety's responsibility, to perform backups and keep copies of Client Data as needed by Client.

15.3    Transfer Restrictions. As between Ntirety and Client, it is the sole responsibility of Client, and not the responsibility of Ntirety, to ensure that Client Data, including End User Data, required to remain in a particular country is restricted to that country. Prior to Client's submission of a SOF or SOW or use of any Services, Client will inform Ntirety in writing of all transfer restrictions or jurisdictional requirements pertaining to Client Data and the Parties will work in good faith together to determine if the transfer restrictions and jurisdictional requirements can be satisfied. Client will review Ntirety's Privacy Policy, as amended from time to time, posted at https://www.ntirety.com/privacy-policy/ (or such other redirected webpage or alternate URL as designated by Ntirety), which is incorporated herein by reference.

15.4    Server Location. Subject to the cross-border processing provisions and Client Data transfer restrictions herein, Ntirety may (a) locate the Systems, including computer servers, containing Client Data at any of Ntirety's data center premises, and (b) relocate the Systems, including computer servers containing Client Data, from one Ntirety data center to any other location owned or operated by Ntirety. Client acknowledges that Ntirety does not guarantee a particular data center location will be available for any specific period of time or that the Systems provided to Client will remain at any given location.

16. **Notice to California Clients**

Client is advised that, as may be applicable to it under California Civil Code Section 1789.3, to initiate a complaint about the Service, Client may contact Ntirety using the Client Portal, or as provided in the applicable Service Level Agreements. If Client is dissatisfied with the manner in which Ntirety responds to a complaint regarding the Services, Client may contact Ntirety at the address set out below Ntirety's signature or by telephone at 1-866-918-4678, and the Complaint Assistance Unit of the Division of Consumer Services of the Department of Consumer Affairs in writing at 1020 N. Street, #501, Sacramento, CA 95814 or by telephone at 1-916-445-1254. The charges for the Services are set out in the applicable SOF or SOW.

17. **Force Majeure**

Except for failure to pay, neither Party will be liable for or be considered in breach of this MSA due to any failure

**Exhibit 2**

Majeure event, Ntirety will (a) promptly give written notice to Client, and (b) make reasonable efforts to mitigate the effect of the Force Majeure.

## 18. **Miscellaneous**

18.1    Relationship of Parties. No person or entity other than Client and Ntirety and their respective successors and permitted assigns is or will be entitled to bring any action to enforce any provision of this MSA against either or both of Client and Ntirety or any related party. The Parties will be considered independent contractors of one another, and neither Party will have the authority to make any representations, claims, or warranties of any kind on behalf of the other Party or on behalf of the other Party's Affiliates, agents, subcontractors, licensors, or third-party suppliers. Nothing in this MSA will be construed as implying a joint venture, agency, employer-employee, or partnership relationship between the Parties.

18.2    Non-Solicitation. During the term of this MSA and for 1 year following its termination or expiration, neither Party will directly or indirectly solicit, offer employment to, employ, or retain as a consultant any employee, consultant, subcontractor, or other agent of the other Party who was associated with the performance of any Services under this MSA without the other Party's prior written consent. Notwithstanding the foregoing, solicitation or hiring via job fairs and advertisements of general circulation will not be considered violations of this clause.

18.3    Notices. Ntirety may deliver operational notices to Client, such as those described in a Service Level Agreement or other Service Addendum to this MSA, via phone, email or Ntirety's Client Portal, and such notices shall be deemed received upon delivery. Notices, requests, consents, and other communications (collectively, "Notices") required or permitted under this MSA will be delivered to Client by means of Ntirety's Client Portal, in which case such Notices shall be deemed received upon delivery. All other Notices to a Party will be in writing and will be deemed to have been received on the earlier of (i) the date of actual receipt (including by facsimile or email), (ii) the first business day after being sent to the designated address by a nationally recognized overnight delivery service, or (iii) the third business day after being mailed to the designated address by first class mail. Notices will be delivered to Ntirety at the address, facsimile or email address stated in the header on page 1 of this MSA. Notices (other than those delivered via the Client Portal) will be delivered to Client at the address, facsimile, or email address provided by Client to Ntirety on this MSA or as recorded in Ntirety's Systems. Either Party may change the address at which it is to receive Notices by giving written notice of its new address to the other Party in accordance herewith. Client is required to maintain current contact information at all times to facilitate communication between the Parties.

18.4    Assignment. This MSA will be binding upon and inure to the benefit of Client, Ntirety, and their respective successors and permitted assigns. Neither Party may assign this MSA without the prior written consent of the other Party, which consent will not be unreasonably withheld or delayed; except that either Party may assign this MSA without the prior consent of the other Party (i) to an Affiliate or (ii) in connection with a merger, corporate reorganization, or sale of all or substantially all of its assets. The sale, assignment, or other transfer of the equity securities or other ownership interests of either Party will not constitute an assignment of this MSA. Any attempt to assign this MSA without the other Party's required consent will be null and void. Notwithstanding the foregoing, Client agrees that Ntirety may delegate performance of any of its obligations hereunder to its Affiliate(s) or to agents or subcontractors selected by Ntirety, except that Ntirety will not be relieved of any of such obligations as a result of such delegation.

18.5    Amendment; Waiver; Severability. Except as otherwise expressly provided in this MSA, this MSA will not be amended and the Services will not be changed except by a written amendment signed by both Parties. The failure or delay to exercise, or the partial exercise of, any right or remedy will not operate as a waiver of, nor affect the right to exercise, any such right or remedy, nor will a waiver of any breach or default constitute a waiver of any subsequent breach or default. The waiver of time for performance will not constitute a waiver of the act or condition itself. The invalidity or unenforceability of any provision of this MSA will not affect the validity or enforceability of any other provision of this MSA, which will remain in full force and effect. Any such invalid or unenforceable provision will be deemed replaced by a provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable provision.

18.6    Governing Law; Interpretation. This MSA will be governed by and construed and enforced in accordance with the laws of the State of Texas, without regard to conflicts of laws principles. The Parties consent to the jurisdiction of the federal or state courts located in Austin, Texas for all disputes between the Parties, and venue will be proper in any such court. Neither Party will contest notice from any such court. THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY DISPUTE BETWEEN THE PARTIES. The United Nations Convention on Contracts for International Sale of Goods will not apply to this MSA or any dispute between the Parties. No presumption or burden of proof will arise favoring or disfavoring a Party by virtue of the authorship of any provision of this MSA. Client acknowledges and agrees that the pricing provided to Client is based largely on the Parties' respective

**Exhibit 2**

rights, obligations, and limitations provided in the MSA. The words "herein", "hereof", "hereto", and "hereunder" and words of similar meaning will refer to this MSA in its entirety, which includes all SOFs or SOWs and addenda, and not to any particular provision of the MSA. Bolding, underlining, or italicizing of words herein are for ease of reference only and the application or omission of them will have no effect on the interpretation of this MSA. When used for listing purposes, the term "including" and "includes" will be deemed to mean "including, but not limited to" or "includes, but is not limited to," as applicable.

8.7     Entire Agreement. This MSA includes the Schedules, SOFs, SOWs, and Service Addenda attached hereto or executed hereunder, states the entire agreement between the Parties, and supersedes all previous proposals, negotiations, and other written and oral communications between the Parties with respect to the subject matter of this MSA. Any additional terms, provisions or conditions included in any purchase order, receipt, acceptance, confirmation or similar form or correspondence that Client may use in connection with the provision of the Services will have no effect on the rights, duties, or obligations of the Parties hereunder, regardless of the signature of the Parties thereto or any failure of Ntirety to object to such additional terms, provision or conditions, unless such terms are included in a mutually executed amendment to this MSA.

8.8     Survival. The provisions of this MSA which expressly survive termination or which, by their nature, should reasonably survive termination of this MSA will survive the expiration or termination of this MSA including Sections 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and 18. If there is a conflict between documents entered into by the Parties, such documents will have the following order of precedence: (i) the SOF(s) or SOW(s), (ii) the Service Addendum or Addenda, and (iii) this MSA.

8.9     Counterparts, Signatures, Legally Binding Agreement. This MSA (and any SOF(s), SOW(s), and Service Addenda) may be executed in any number of separate counterparts, and in each case, will collectively and separately constitute one agreement. Signatures may be exchanged by facsimile or .PDF or other electronic means, and any signature exchanged by any such means will be deemed an original. Client may also assent to this MSA, the SOFs, SOWs, and/or Service Addenda by accepting any such document without modification in an on-line transaction via the Client Portal. Client understands and agrees that by clicking to agree to this MSA, any SOF, any SOW, and/or any Service Addendum, Client is entering into a legally binding agreement, with the same force and effect as a signature affixed by hand, and that it will not contest the validity or enforceability of those electronic transmissions under the statute of frauds. The person executing or clicking to agree to this MSA, any SOF, any SOW and/or any Service Addendum on behalf of Client represents and warrants to Ntirety that such person has the authority to enter into such document on behalf of Client.


**SCHEDULE 1**

**DEFINED TERMS**

"Acceptable Use Policy" means the policy available online at https://www.ntirety.com/AUP (or at such other URL as Ntirety may dictate from time to time) which defines the acceptable uses of the Services.

"Affiliate" means any person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with such first person, with "control" meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, and "person" broadly construed to include any natural person or any incorporated or unincorporated entity or association, trust, joint venture, joint stock company or other entity.

"Billing Cycle" means the recurring period of time (for example, monthly, quarterly, or annually") for which Service Fees are payable by Client to Ntirety as specified in the SOF, SOW, Client Portal, or invoice (as applicable).

"Claim" means any claim, demand, action, or proceeding (including law suits and administrative proceedings).

"Client Account" means the account set up by Ntirety, attributed exclusively to Client and used for the provisioning and administration of the Services to Client.

"Client Data" means personal information relating to Client and data owned or controlled by Client, including (a) names, addresses, and other personally identifiable information pertaining to Client; (b) usage data collected by Client regarding Client's own use of the Services, (c) Client's content hosted on the Systems, including Client's Uniform Resource Locators, Web pages and other website data, software and applications, Protected Healthcare Information as such term is further described in the appropriate section below, and (d) any of the same relating to or owned by an End User.

"Client Portal" means Ntirety's online portal or interactive means used to manage the Client Account and associated

**Exhibit 2**

Services.

"Confidential Information" means all non-public information, know-how, and trade secrets in any form disclosed by one Party to the other Party and that are designated by the disclosing Party as confidential or are known, or under the circumstances should be known, to be confidential. For the avoidance of doubt, the following items will be considered Confidential Information: this MSA and Ntirety's network configuration, and the following items will not be considered Confidential Information: information that is or becomes publicly known or available without breaching this MSA, information that is or was previously disclosed to the receiving party by a third party without any confidentiality restriction, information that is independently developed without using any Confidential Information or otherwise breaching this MSA, reference to the other Party by name as a vendor or customer, or the existence and general nature of this MSA (but not any specific terms of this MSA).

"Effective Date" means the date on which Client clicks to accept this MSA online or signs on the signature page attached hereto (as applicable).

"End User" or "End Users" means a party or parties (including Client's employees, customers, contractors, consultants, or other third parties) that have access to or use of the Services by or through Client.

"Force Majeure" means a circumstance beyond a Party's reasonable control, including a natural disaster, act of God, military or terrorist act, change in law, labor dispute, utility disruption or outage, malfunction of equipment or software, loss or corruption of data, interruption of or delay in transportation, public health crisis, failure by any supplier or other third party to perform, or act or omission of the other Party.

"Intellectual Property" means any and all rights, title, interest, and ownership, whether by registration, statute, common law or other operation of law, in and to: (a) copyrights, (b) patents, (c) trademarks, (d) trade secrets, (e) any other proprietary, intellectual, or industrial property rights of any kind or nature, (f) registrations and registration applications of the foregoing in any jurisdiction, (g) in Ntirety's case, Ntirety Data and the Systems, and (h) in Client's case, Client Data.

"Invoice Date" means the earlier of (a) the date the Client receives the invoice or (b) the date the invoice is published in the Client Portal.

"Losses" means any loss, liability, damage, penalty, cost, or expense (including reasonable attorneys' fees, witness compensation, and court fees).

"Ntirety Data" means any data relating to Ntirety and all Services and Systems, including (a) Internet Protocol addresses, Uniform Resource Locators, web pages and other website data, (b) source codes, digital files, encryption keys, and digital certificates, (c) user identifications, account access, log in information, and passwords, (d) usage data collected by Ntirety regarding Client's use of the Services, and (e) all other data owned or controlled by Ntirety.

"Privacy Policy" means the policy available online at https://www.ntirety.com/privacy-policy (or at such other URL as Ntirety may dictate from time to time) which describes Ntirety's use and processing of Client Data.

"Renewal Term" means successive Service periods equal to the length of the SOF Initial Term or SOW Service Term (as applicable).

"Representatives" means, collectively, a Party's shareholders, Affiliates, directors, officers, employees, contractors, agents, and advisors, including lawyers, accountants, consultants, financial advisors, bankers, and lenders.

"Service(s)" means the service(s) set out on each SOF or SOW that are provided by Ntirety to Client subject to and in accordance with the terms of this MSA.

"Service Addendum" means an addendum to this MSA that sets forth certain Service-specific terms, the plural of which is "Service Addenda."

"Service Fees" means the money amounts or rates, specified in, as applicable, the SOF or SOW, Client Portal, or invoice from Ntirety, or which Client has otherwise agreed to pay to Ntirety in consideration of the Services provided. Unless specified in the relevant SOF, Service Fees recur monthly even if Client does not use the Services.

"Setup Fee" means the one-time fee specified in the applicable SOF or SOW charged to Client for Ntirety to customize and otherwise prepare the Systems according to the specifications in the SOF or SOW.

"SLA" or "Service Level Agreement" means the terms governing the availability or uptime of the Services and Systems, and the standards for Ntirety's Technical Support.

"SOF" means a Service order form executed by Client that sets forth the specifications of the Services ordered by Client.

**Exhibit 2**

"SOF Availability Date" means the date on which Ntirety notifies Client, either by email or through the Client Portal, that the Services are first available to Client for use.

"SOF Initial Term" means the specific Service period described in the SOF, during which time Client may not terminate the SOF, any Services ordered thereunder, or this MSA except as provided in Section 4.

"SOF Start Date" means the date on which Client signs the SOF or clicks to accept the SOF in the Client Portal (as applicable).

SOW" means a statement of work executed between the Parties for Professional Services performed by Ntirety for Client.

"SOW Service Term" means the specific Service period described in the SOW, during which time Client may not terminate the SOW, any Services ordered thereunder, or this MSA except as provided in Section 4.

"Systems" means the technology (including all systems, networks, facilities, infrastructure, computer servers, other hardware, software, online application program interfaces, Internet Protocol addresses, and other technologies) owned, licensed, controlled, or otherwise used by Ntirety to provide the Services to Client, and, as applicable, to End Users and Client Affiliates.

"Technical Support" means the assistance and advice Ntirety's technical support staff provides to Client, as part of the Services, via electronic mail, telephone, or other means of communication as designated by Ntirety (including the Client Portal).

"Term" means the effective period of this Agreement.

"Termination Fees" means the monetary amount equal to the average monthly Service Fee described on the applicable SOF(s) or SOW(s) being terminated multiplied by the lesser of (a) the number of months remaining in the SOF Initial Term, SOW Service Term, or Renewal Term, as applicable, calculated from the termination date, or (b) 12 months.

"Third Party Products" means the equipment, software, products or services procured from a Third Party Vendor which Ntirety, in turn, provides to Client as part of, or in combination with, Ntirety's own products and services which are part of the Services

"Third Party Vendor" means a third party vendor who provides Ntirety with Third Party Products to be, in turn, provided to Client by Ntirety as part of, or in combination with, the Services.

"Third Party Vendor Audit" means an audit performed by either Ntirety or a Third Party Vendor with respect to the Third Party Products.

**SCHEDULE 2**

**THIRD PARTY VENDOR TERMS AND CONDITIONS**

The following terms and conditions govern Client's use of the specified Third Party Products.

1) **Microsoft Products**

If Client orders Services that include Microsoft software, then Client agrees to the Microsoft End User License Terms which are incorporated into the MSA by reference:

THIS DOCUMENT GOVERNS THE USE OF MICROSOFT SOFTWARE, WHICH MAY INCLUDE ASSOCIATED SOFTWARE, MEDIA, PRINTED MATERIALS, AND "ONLINE" OR ELECTRONIC DOCUMENTATION (INDIVIDUALLY AND COLLECTIVELY, "PRODUCTS") PROVIDED BY NTIRETY. NTIRETY DOES NOT OWN THE PRODUCTS AND THE USE THEREOF IS SUBJECT TO CERTAIN RIGHTS AND LIMITATIONS OF WHICH NTIRETY MUST INFORM YOU. YOUR RIGHT TO USE THE PRODUCTS IS SUBJECT TO THE TERMS OF YOUR AGREEMENT WITH NTIRETY, AND TO YOUR UNDERSTANDING OF, COMPLIANCE WITH, AND CONSENT TO THE FOLLOWING TERMS AND CONDITIONS, WHICH NTIRETY DOES NOT HAVE AUTHORITY TO VARY, ALTER, OR AMEND.

1. DEFINITIONS.

"Client Software" means software that is installed on a Device that allows the Device to access or utilize the Products.

**Exhibit 2**

"Device" means each of a computer, workstation, terminal, handheld PC, pager, telephone, personal digital assistant, "smart phone," server or any other hardware where software can be installed that would allow End User to interact with the Product.

"End User" means an individual or legal entity that obtains Software Services directly from Ntirety, or indirectly through a Software Services Reseller

"Redistribution Software" means the software described in Paragraph 4 ("Use of Redistribution Software") below.

"Software Services" means services that Ntirety provides to you that make available, display, run, access, or otherwise interact, directly or indirectly, with the Products. Ntirety must provide these services from data center(s) through the Internet, a telephone network or a private network, on a rental, subscription or services basis, whether or not Ntirety receives a fee. Software Services exclude any services involving installation of a Product directly on any End User device to permit an End User to interact with the Product.

2. OWNERSHIP OF PRODUCTS. The Products are licensed to Ntirety from an affiliate of the Microsoft Corporation (collectively "Microsoft"). Microsoft Products are protected by copyright and other intellectual property rights. Products and other Product elements including but not limited to any images, photographs, animations, video, audio, music, text and "applets" incorporated into the Products are owned by Microsoft or its suppliers. You may not remove, modify or obscure any copyright trademark or other proprietary rights notices that are contained in or on the Products. The Products are protected by copyright laws and international copyright treaties, as well as other intellectual property laws and treaties. Your possession, access, or use of the Products does not transfer any ownership of the Products or any intellectual property rights to you.

3. USE OF CLIENT SOFTWARE. You may use the Client Software installed on your Devices only in accordance with your agreement with Ntirety and the terms under this document, and only in connection with the Software Services, provided to you by Ntirety. The terms of this document permanently and irrevocably supersede the terms of any Microsoft End User License Agreement that may be presented in electronic form during the installation and/or use of the Client Software.

4. USE OF REDISTRIBUTION SOFTWARE. In connection with the Software Services provided to you by Ntirety, you may have access to certain "sample," "redistributable" and/or software development software code and tools (individually and collectively "Redistribution Software"). You may use, copy and/or install the Redistribution Software only in accordance with the terns of your agreement with Ntirety and this document and/or your agreement with Ntirety.

5. COPIES. You may not make any copies of the Products; provided, however, that you may (a) make one copy of Client Software on your Device as expressly authorized by Ntirety; and (b) you may make copies of certain Redistribution Software in accordance with Paragraph 4 (Use of Redistribution Software). You must erase or destroy all such Client Software and/or Redistribution Software upon termination or cancellation of your agreement with Ntirety, upon notice from Ntirety or upon transfer of your Device to another person or entity, whichever occurs first. You may not copy any printed materials accompanying the Products.

6. LIMITATIONS ON REVERSE ENGINEERING, DECOMPILATION AND DISASSEMBLY. You may not reverse engineer, decompile, or disassemble the Products, except and only to the extent that applicable law, notwithstanding this limitation, expressly permits such activity.

7. NO RENTAL. You may not rent, lease, lend, pledge, or directly or indirectly transfer or distribute the Products to any third party, and may not permit any third party to have access to and/or use the functionality of the Products except for the sole purpose of accessing the functionality of the Products in the form of Software Services in accordance with the terms of this agreement and any agreement between you and Ntirety.

8. TERMINATION. Without prejudice to any other rights, Ntirety may terminate your rights to use the Products if you fail to comply with these terms and conditions. In the event of termination or cancellation of your agreement with Ntirety or Ntirety's agreement with Microsoft under which the Products are licensed, you must stop using and/or accessing the Products, and destroy all copies of the Products and all of their component parts within 30 calendar days of the termination of your agreement with Ntirety.

9. NO WARRANTIES, LIABILITIES OR REMEDIES BY MICROSOFT. Microsoft disclaims, to the extent permitted by applicable law, all warranties and liability for damages by Microsoft or its suppliers for any damages and remedies whether direct, indirect or consequential, arising from the Software Services. Any warranties and liabilities are provided solely by Ntirety and not by Microsoft, its affiliates or subsidiaries.

10. PRODUCT SUPPORT. Any support for the Software Services is provided to you by Ntirety or a third party on Ntirety's behalf and is not provided by Microsoft, its suppliers, affiliates or subsidiaries.

11. NOT FAULT TOLERANT. The Products are not fault-tolerant and are not guaranteed to be error free or to operate uninterrupted. You must not use the Products in any application or situation where the Product(s) failure could lead to death or serious bodily injury of any person, or to severe physical or environmental damage ("High Risk Use").

12. EXPORT RESTRICTIONS. The Products are subject to U.S. export jurisdiction. Ntirety must comply with all applicable laws including the U.S. Export Administration Regulations, the International Traffic in Arms Regulations, as well as end-user, end-use and destination restrictions issued by U.S. and other governments. For additional information, see http://www.microsoft.com/exporting/.

13. LIABILITY FOR BREACH. In addition to any liability you may have to Ntirety, you agree that you will also be legally responsible directly to Microsoft for any breach of these terms and conditions.

14. INFORMATION DISCLOSURE. You must permit Ntirety to disclose any information requested by Microsoft under the

**Exhibit 2**

Ntirety's Agreement. Microsoft will be an intended third party beneficiary of your agreement with Ntirety, with the right to enforce provisions of your agreement with Ntirety and to verify your compliance.

If Client orders Microsoft Azure Public Cloud or Office 365 Services, then Client agrees to the Microsoft Cloud Agreement and Microsoft Online Services Terms which are incorporated into the MSA by reference.

(a) http://download.microsoft.com/download/2/C/8/2C8CAC17-FCE7-4F51-9556-4D77C7022DF5/MCA2017Agr_NA_ENG_Sep20172_CR.pdf

(b) http://www.microsoftvolumelicensing.com/Downloader.aspx?DocumentId=13867

If Client is License Mobility through Software Assurance to utilize their own Microsoft licenses (the "MS Licenses") on the Systems, Client agrees to the Microsoft License Mobility Terms and Conditions which are incorporated into the MSA by reference.

1. In order to exercise License Mobility through Software Assurance rights, Client must submit the License Mobility Verification Form located at https://www.microsoft.com/en-us/licensing/licensing-programs/software-assurance-license-mobility.aspx or at a successor site. Client agrees to submit the form to Microsoft within 10 days of deployment, whenever renewing Client's Microsoft volume license agreement, and whenever renewing Client's Software Assurance with Microsoft. It is expected that Microsoft will provide Ntirety with confirmation of Client's verification status each time it is submitted.

2. Ntirety cooperates in good faith with Microsoft to investigate and remedy any potential non-compliance. Upon request from Microsoft, Ntirety will provide information pertaining to Client's environment, including but not limited to:

○ The number of cloud or dedicated instances provided to Client by Ntirety;

○ A list of Microsoft products run on such cloud or dedicated instances;

○ Copies of Client's License Mobility Verification Form.

3. In the event that Microsoft finds Client is noncompliant with any MS License, Ntirety will be required to terminate hosting of Client's noncompliant license(s) within 30 calendar days if no action on Client's part is taken to remove them or replace such noncompliance MS License(s) with valid licenses from Ntirety or Microsoft.

4. Client's licenses under License Mobility through Software Assurance must remain on Ntirety's cloud servers within a single datacenter for no less than 90 calendar days. Client may move licenses from a cloud server within a single datacenter to a cloud server in another data center, but not within 90 days after the last assignment.

**2) Amazon Products**

If Client orders Amazon AWS Public Cloud Services, then Client agrees to the Amazon Client Agreement and Amazon AWS Service Level Agreement which are incorporated into the MSA by reference.

(a) https://aws.amazon.com/agreement/

(b) https://aws.amazon.com/legal/service-level-agreements/

**3) Red Hat Products**

If Client orders Services that includes Red Hat software, then Client agrees to the Red Hat Cloud Services Subscription Agreement which are incorporated into the MSA by reference:

(a) www.redhat.com/licenses/cloud_cssa/



**SERVICES**
Data
Security
Cloud

**RESOURCES**
Trust Center
Blog
Content Library

**COMPANY**
Company Overview
Leadership
Press
Careers
Contact

**CONNECT**
LinkedIn
X
YouTube





Exhibit 2

© Ntirety 2025. All Rights Reserved.        Privacy Policy   Acceptable Use Policy

Exhibit 2